[No. H011544. Sixth Dist. Dec. 13, 1994.]

CALIFORNIA ASSOCIATION FOR SAFETY EDUCATION et al.,
Plaintiffs and Appellants, v.
KATHLEEN BROWN, as State Treasurer, etc., et al., Defendants and
Respondents.

**COUNSEL**

David S. Sabih for Plaintiffs and Appellants.

Joseph R. Symkowick, Marcia Leitner and Roger Kempler as Amici Curiae on behalf of Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Floyd D. Shimomura, Assistant Attorney General, Linda A. Cabatic and Shelleyanne W. L. Chang, Deputy Attorneys General, for Defendants and Respondents.

**OPINION**

**ELIA, J.**—Appellants ask that the state pay for driver training for public high school students. They claim moneys from the Drivers Training Penalty Assessment Fund (DTPAF) should be used for this purpose. (Pen. Code, § 1464; Ed. Code, § 41304.) After the trial court denied their petition for a writ of mandamus and preliminary injunction, appellants filed this appeal.[1]

On appeal, they argue (1) fees charged by a high school district for driver training violate the free school guarantee of the California Constitution (Cal.

[1]Appellants are the California Association for Safety Education, Theodore Redenius, Franklin Hall, William S. Hart Union High School District and Marsha Hogan. Theodore Redenius is the governmental affairs director of the California Association for Safety Education. He "is a person who is assessed for and is liable to pay state sales tax, income taxes, gasoline taxes, penalty assessments, and who within one year last past before the commencement of this proceeding, has paid state sales tax, income and gasoline taxes, and who sues herein as a resident citizen and taxpayer of the State on a matter of great public interest, to obtain a judgment, restraint and prevention of illegal expenditures, waste and injury to State funds, pursuant to Sec. 526a of the Code of Civil Procedure . . . ." Franklin Hall is a resident of the County of Monterey. In January 1991, he received a moving violation citation. In March 1991, he paid a fine of $117.50. Marsha Hogan is a student who underwent driver training at William S. Hart Union High School District and paid $130 for the driver training. She was not reimbursed by the state. She sues "on behalf of herself and on behalf of every

Const., art. IX, § 5); (2) the refusal to use DTPAF funds to pay for driver training constitutes an illegal expenditure of funds; (3) the state breached its contractual obligation to reimburse school districts for driver training expenses; (4) the DTPAF constitutes a trust fund; and (5) the state violated the equal protection clause. (Cal. Const. art. I, § 7.) For reasons we shall explain, we hold that the fees charged by the high school district for driver training violate the free school guarantee. We also hold that DTPAF funds may be used to pay for driver training only if there is an appropriation in the annual Budget Act. (Ed. Code, § 41305.)

### Facts and Procedural Background

On June 23, 1993, appellants petitioned for writ of mandamus and preliminary injunction in aid of mandamus. They asserted claims for (1) violation of trust; (2) violation of equal protection laws; and (3) class action.

On June 28, 1993, appellants amended their petition. In the amended petition, they also asserted that the state had violated the contract clause of the United States and California Constitutions and sought to enjoin respondents from transferring any moneys from the DTPAF to any other fund or the General Fund. Appellants sought an order compelling respondents to reimburse school districts and California high school students for the cost of driver training courses.[2]

On June 28, 1993, appellants filed an ex parte application and supporting declaration for a temporary restraining order. They sought to prevent respondents from transferring moneys from the DTPAF to the General Fund or any other fund. On June 29, 1993, respondents filed their opposition.

On June 30, 1993, the trial court denied appellants' application for a temporary restraining order. On July 16, 1993, respondents filed a return to appellants' amended petition for alternative writ of mandamus and injunctive relief by way of answer.

On July 30, 1993, the trial court issued its decision. It stated, "I sympathize with the frustration of the Petitioners. The legislature saw fit to

high school student in the state of California who took driver training from a school district and paid monies, and by this petition seeks reimbursement of all monies on behalf of every high school student in the state of California."

Respondents are the Treasurer of the State of California, Kathleen Brown; the Controller of the State of California, Gray Davis; the Finance Director of the State of California, Thomas Hayes; and the Governor of the State of California, Pete Wilson.

[2]Despite the reference to a class action in appellants' opening brief, this action was never certified as a class action.

designate a portion of the State Penalty Fund to go to the Driver Training Penalty Assessment Fund and the remainder to others. Apparently all of the others eventually receive[d] [this] funding. The DT[PA]F does not. As a result, no funds are allocated from the penalty collected to student driver training. Not everyone can afford to do this on their own. All of us who use the roads may suffer. [¶] Notwithstanding, under applicable law, this is not a 'trust' fund; the equal protection clause does not apply to these situations; it is not a 'continuing' appropriation; and, since the decision was made prior to the beginning of the fiscal year, no monies were spent in reliance thereon. I know of no legal basis to compel the government to act in the manner requested by Petitioners. [¶] The petition for Writ of Mandate is DENIED."

### Statutory Scheme

The Legislature has authorized the Superintendent of Public Education to "promote and direct the establishment and maintenance of courses of instruction in automobile *driver education* and *driver training* in the public schools." (Ed. Code, § 41904, italics added.)

Education Code[3] section 41912 provides, "The expressed purpose of the Legislature is that highway accidents can and must be reduced through the *education* and *training of drivers* prior to licensing, and that *this instruction properly belongs in the high school curriculum* on a basis of having comparable standards of instruction, quality, teacher-pupil ratio and class scheduling in driver education as in other courses in the regular academic program. Only through a high quality program of driver instruction can the greatest potential in traffic accident prevention be realized. Further, *the state has a responsibility to share in the reasonable costs of providing such courses.*" (Italics added.)

Driver education is a required high school course. Driver education instruction must comply with State Department of Education guidelines. (Cal. Code Regs., tit. 5, § 10020.) Driver education must be offered "within the regular schoolday, and within the regular academic year." (§ 51851, subd. (b).) It is "designed to develop a knowledge of the provisions of the Vehicle Code and other laws of this state relating to the operation of motor vehicles, a proper acceptance of personal responsibility in traffic, a true appreciation of the causes, seriousness and consequences of traffic accidents, and to develop the knowledge and attitudes necessary for the safe operation of motor vehicles." (§ 51220, subd. (j).)

---

[3]All further unspecified statutory references are to the Education Code.

Driver training, on the other hand, is the "laboratory phase of driver education." (§ 51852.) It involves behind-the-wheel driving instruction. Under section 41306, "[i]t is the intent of the Legislature that driver training instruction be provided pupils as a part of the high school curriculum . . . ."

Driver training is usually provided in a dual-control automobile with a qualified instructor. Driver training classes must comply with detailed regulatory requirements. (§ 51850; Veh. Code, § 12507; Cal. Code Regs., tit. 13, § 400.00 et seq.) A school district has discretion to offer driver training as an elective in its high schools. However, if it is offered, section 41902 provides that "no tuition shall be charged."

Finding that driver training prevents accidents, the Legislature requires that persons under age 18 complete driver training before obtaining a driver's license. (Veh. Code, § 12507.) To standardize instruction, the Legislature has prescribed the qualifications for instructors and their compensation, guidelines for pupil eligibility, standards for automobiles used, and minimum syllabus requirements for driver training courses. (§§ 41908, 51850-51854; Cal. Code Regs., tit. 5, §§ 10040-10043.)

Under the system, school districts pay for the cost of providing instruction. In doing so, they are guided by statutes that prescribe the type of reimbursable costs and establish upper limits on the amounts that may be appropriated for such costs. (§§ 41304, subd. (b), 41306.) If instruction is provided, each district must report its costs to the superintendent, who must then determine and allow costs up to certain maximum amounts and certify a total amount to the Legislature for appropriation. (§§ 41304, subd. (b); 41900-41901, 41903, 41909.)

Funding for driver training programs is linked to fines imposed for Vehicle Code violations. Penal Code section 1464 provides a statutory scheme for the collection and disbursement of fines and penalties received from California state drivers who violate provisions of the Vehicle Code.

Under Penal Code section 1464, subdivision (e), after an appropriate fine or penalty for a Vehicle Code violation is determined, the county clerk is directed to collect the penalty and transmit it to the county treasury. A portion of the funds is deposited to the appropriate county fund. The balance is transmitted to the State Treasury.

Of the amounts transmitted to the State Treasury, 30 percent is deposited into the State General Fund and 70 percent is deposited into the State Penalty Fund. (Pen. Code, § 1464, subd. (e).) Each month, the moneys

deposited into the State Penalty Fund are disbursed in statutory percentages to the Fish and Game Preservation Fund, the Peace Officer's Training Fund, the Restitution Fund, the Corrections Training Fund, the Local Public Prosecutors and Public Defenders Training Fund, the Victim-Witness Assistance Fund, the Traumatic Brain Injury Fund, and the DTPAF. This distribution to these funds is done automatically and without the necessity of an appropriation by the Legislature. (Pen. Code, § 1464, subd. (f).)

Under section 41304, subdivision (b), amounts from DTPAF "shall be appropriated," subject to section 41305, in sums certified by the Superintendent of Schools as necessary to reimburse school districts, county superintendent of schools, the Department of the Youth Authority, and the State Department of Education, for the actual costs of driver training courses.[4]

Section 41305 limits the sums provided under section 41304 to whatever amounts are appropriated in the annual Budget Act for driver training costs. It provides, in pertinent part, "The amounts provided under Section 41304 for any fiscal year *shall be limited to the amounts appropriated in the annual Budget Act for the purposes of that section, . . .*" (Italics added.)[5]

As demonstrated above, a statutory framework exists for reimbursement of driver training costs.[6] In the past, the Legislature has appropriated an amount which, when allocated to the school districts, reimbursed them for most, if not all, of their driver training expenses. In 1990, the Legislature's budget bill included an appropriation of $21,236,000 for reimbursement.

---

[4]Section 41304 provides, in pertinent part, that "there shall be appropriated from the Driver Training Penalty Assessment Fund to the General Fund, then to the State School Fund each fiscal year, the sum the Superintendent of Public Instruction certifies as necessary to reimburse on a quarterly basis for each current fiscal year school districts, county superintendents of schools, the Department of the Youth Authority, and the State Department of Education for the actual cost of instructing pupils in the operation of motor vehicles. [¶] The amount shall not exceed ninety-seven dollars ($97) per pupil instructed in the laboratory phase of driver education in accordance with the rules and regulations of the State Board of Education."

[5]Section 41305 provides, "The amounts provided under Section 41304 for any fiscal year *shall be limited to the amounts appropriated in the annual Budget Act for the purposes of that section,* and shall not exceed an amount equal to the sum of the moneys credited to the Driver Training Penalty Assessment Fund in the State Treasury during the preceding fiscal year and the amount by which the deposits in the Driver Training Penalty Assessment Fund on or after September 15, 1961, have exceeded the amounts required to reimburse the General Fund on account of transfers made after such date." (Italics added.)

[6]In 1953, the Legislature enacted as an urgency measure the "Stanley Driver Education and Driver Training Law," encouraging county districts to provide driver training and promising to pay their expenses. (Stats. 1953, ch. 1877, § 1 et seq., pp. 3664-3666.)

(See Stats. 1990, ch. 467, § 2, item 6110-171-178.) The Governor exercised his line-item veto power and reduced the proposed appropriation to $1,000. (Stats. 1990, ch. 467; Cal. Const., art. IV, § 10, subd. (b).) The Legislature did not override this reduction. Thus, the Budget Act provided school districts with a total of $1,000 as reimbursement.[7]

Incorporated within section 24.10 of the Budget Act was the following language: "Notwithstanding the provisions of Section 1464 of the Penal Code, added by Chapter 530, Statutes of 1980, and Section 41304 of the Education Code, the State Controller *shall transfer the unencumbered balance in the Driver Training Penalty Assessment Fund on June 30, 1991, to the General Fund.*" (Stats. 1990, ch. 467, § 24.10.)

The Governor's budget for 1991-1992 proposed to restore $21 million in driver training funding. The legislative analyst recommended deletion of the proposed restoration because "this program primarily serves individual rather than statewide interests." (Analysis of the 1991-1992 Budget Bill, rep. from the Legis. Analyst's office to the Joint Legis. Budget Com., pp. 953-954.) The final Budget Act appropriated $10 million from the DTPAF. (Stats. 1991, ch. 118, item 6110-171-178.)

The Legislature did not appropriate funds for driver training in the 1992-1993 or 1993-1994 Budget Acts. However, each new Budget Act has included a new section 24.10. (Stats. 1991, ch. 118; Stats. 1992, ch. 587; Stats. 1993, ch. 55.) Although the Legislature passed Senate Bill No. 453, which appropriated $15.2 million from the DTPAF, the Governor vetoed the bill.

Appellants seek to prohibit the transfer of moneys contained in the DTPAF to the General Fund of the State of California. Appellants presumably challenge section 24.10 of chapter 587 of the Statutes of 1992 and section 24.10 of Senate Bill No. 80, amended June 30, 1993, of the 1993-1994 Regular Session of the California Legislature, both of which, as noted above, directed the State Controller to transfer the unencumbered balance in the DTPAF on June 30, 1993, to the State General Fund.

---

[7]A lawsuit was filed as a result of the de minimis $1,000 appropriation. In *Salinas Union High School Dist.* v. *Honig* (Cal.App.), we held that the appellants in that case had obtained a vested right to reimbursement for driver training after providing free driver training with the expectation that they would be reimbursed by the state. Although many similar arguments are raised in this appeal, this case differs from *Salinas* in that the statutory scheme has been amended. Further, the school district here has not provided free driver training with the expectation of reimbursement, perhaps in recognition of these statutory changes.

## Discussion

### I. Amicus Curiae

Amicus curiae briefs have been filed by several different individuals and entities. In their briefs, amicus curiae raise many new arguments.[8] These contentions were not raised by appellants. Nor were these arguments considered by the trial court.

It is a general rule that an amicus curiae accepts a case as he or she finds it. (*E.L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 510 [146 Cal.Rptr. 614, 579 P.2d 505].) Amicus curiae may not "launch out upon a juridical expedition of its own unrelated to the actual appellate record." (*Pratt* v. *Coast Trucking, Inc.* (1964) 228 Cal.App.2d 139, 143 [39 Cal.Rptr. 332]; see also *Great Western Sav. & Loan Assn.* v. *City of Los Angeles* (1973) 31 Cal.App.3d 403, 413, fn. 14 [107 Cal.Rptr. 359].)

In *Knetsch* v. *United States* (1960) 364 U.S. 361, 370 [5 L.Ed.2d 128, 134, 81 S.Ct. 132], the United States Supreme Court stated, "Some point is made in an *amicus curiae* brief of the fact that Knetsch in entering into these annuity agreements relied on individual ruling letters issued by the Commissioner to other taxpayers. *This argument has never been advanced by petitioners in this case. Accordingly, we have no reason to pass upon it.*" (Italics added.)

The same analysis was applied in *Bell* v. *Wolfish* (1979) 441 U.S. 520, 531-532, footnote 13 [60 L.Ed.2d 447, 463-464, 99 S.Ct. 1861]. In that case, the Supreme Court stressed that the argument by amicus curiae was not "presented to or passed on by the lower courts; nor have they been urged by either party in this Court." For this reason, the court declined to consider the argument. (*Ibid.*) The court again declined to consider contentions raised by amicus curiae in *United Parcel Service, Inc.* v. *Mitchell* (1981) 451 U.S. 56, 60, fn. 2 [67 L.Ed.2d 732, 738-739, 101 S.Ct. 1559].) Since the argument was not raised by the parties either at trial or on appeal, the court refused to entertain it. (*Ibid.*)

---

[8] Amicus curiae briefs were filed by the Acting Superintendent of Public Instruction, William D. Dawson, Senator Ralph C. Dills, the California Teacher's Association, the California School Board's Association, and various school districts. An amicus brief was also filed by the California State Automobile Association and the Automobile Club of Southern California In their briefs, amici curiae contend that (1) charging fees for driver training violates the free school clause; (2) the Governor improperly exercised his veto power in 1990; (3) certain legislation violated the single subject rule; and (4) the Budget Act constituted an unconstitutional special law. (Cal. Const. art. IV, § 16, subd. (b).)

California courts refuse to consider arguments raised by amicus curiae when those arguments are not presented in the trial court, and are not urged by the parties on appeal. " 'Amicus curiae must accept the issues made and propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curiae will not be considered [citations].' " (*Pratt* v. *Coast Trucking, Inc. supra*, 228 Cal.App.2d at p. 143, quoting *Eggert* v. *Pacific States S. & L. Co.* (1948) 57 Cal.App.2d 239, 251 [136 P.2d 822]; see also *Younger* v. *State of California* (1982) 137 Cal.App.3d 806, 813 [187 Cal.Rptr. 310].)

In *Younger* v. *State of California, supra*, 137 Cal.App.3d 806, 813, the court did not review amicus curiae's arguments. The court explained, " ' "[T]he rule is universally recognized that an appellate court will consider only those questions properly raised by the appealing parties." ' " (*Id.* at p. 813, quoting *Pratt* v. *Coast Trucking, Inc., supra*, 228 Cal.App.2d at p. 143.) Similarly, in *Bruno* v. *Superior Court* (1990) 219 Cal.App.3d 1359, 1364-1365 [269 Cal.Rptr. 142], the court declined to address new issues raised by amicus curiae.

In *E.L. White, Inc.* v. *City of Huntington Beach, supra*, 21 Cal.3d at pages 510-511, the California Supreme Court recognized the general rule but nonetheless considered an issue raised for the first time by amicus curiae. The court stated, "we believe that a consideration of the matter sought to be raised is incumbent upon us because (1) the appellate posture of this case—i.e., an appeal from a judgment of dismissal following the sustaining of a general demurrer without leave to amend—requires that we affirm the judgment if correct on any theory [citation], and (2) a question of jurisdictional dimension appears to be involved [citations]." (*Id.* at p. 511.)

This case is different from *E.L. White*. First, amici curiae request that the trial court's ruling be *reversed*. Thus, unlike *E.L. White*, amici curiae's contentions are not reviewable under the theory that the trial court ruling should be affirmed if correct on any ground. Second, there is no jurisdictional question involved. The arguments presented by amici curiae do not raise any such jurisdictional issues.

Accordingly, we will follow the general rule. Since amici curiae's contentions were not raised below, and have not been presented by appellants on appeal, we will not consider them now. Amici curiae must take the case as they find it. Interjecting new issues at this point is inappropriate.

## II. *Free School Clause*

 Appellants contend that the fees charged by the high school district for driver training violate the free school guarantee of the California Constitution.[9] We agree.

"In considering the constitutionality of a legislative act we presume its validity, resolving all doubts in favor of the Act. Unless conflict with a provision of the state or federal Constitution is clear and unquestionable, we must uphold the Act. [Citations.] Thus, wherever possible, we will interpret a statute as consistent with applicable constitutional provisions, seeking to harmonize Constitution and statute." (*California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193]; see also *Arcadia Unified School Dist.* v. *State Dept. of Education* (1992) 2 Cal.4th 251, 260 [5 Cal.Rptr.2d 545, 825 P.2d 438].)

California's free school guarantee provides that "[t]he Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established." (Cal. Const., art. IX, § 5.) The free school clause authorizes "the youth of the State . . . to be educated at the public expense." (*Ward* v. *Flood* (1874) 48 Cal. 36, 51.)

The free school guarantee was enacted at the 1878-1879 Constitutional Convention. Unlike the 1849 constitutional provision, it required schools to be "free." (See Debates & Proceedings, Cal. Const. Convention 1878-1879, p. 1100, remarks of Mr. Winans.) Joseph Winans, the chairperson for the convention's Committee on Education, stated, "public education forms the basis of self-government and constitutes the very corner stone of republican institutions." (See Debates & Proceedings, Cal. Const. Convention 1878-1879, p. 1087.)

The 1878-1879 constitutional debates give little guidance about the meaning of the term "free school." It was simply noted that "[a] free school is a school at which pupils may attend without charge." (See Debates & Proceedings, Cal. Const. Convention 1878-1879, p. 1100, remarks of Mr. Jones; see also *Arcadia Unified School Dist.* v. *State Dept. of Education, supra,* 2 Cal.4th at p. 260.)

---

[9]In their brief, appellants state that section 41902 provides that "no tuition shall be charged" for driver training. Amici claim the fee violates the free school guarantee. Although not expressly phrased in terms of a violation of the free school guarantee, this is the gist of appellants' contention and therefore, despite inartful briefing, we will review the claim in this appeal.

In 1984, the California Supreme Court rendered its seminal decision on the meaning of the free school clause. In *Hartzell* v. *Connell* (1984) 35 Cal.3d 899 [201 Cal.Rptr. 601, 679 P.2d 35], taxpayers challenged fees charged by a high school district for participating in extracurricular music and sports activities. The Supreme Court held that the fees violated the free school guarantee of the California Constitution. (Cal. Const., art. IX, § 5.)

In so deciding, *Hartzell* described the political, economic, and social aspects of education. *Hartzell* stressed that education enables students to be actively involved in political affairs. (35 Cal.3d at p. 907, citing *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 607-608 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].) Education also prepares students to participate in labor unions and business enterprises and is " 'an essential step in providing the disadvantaged with the tools necessary to achieve economic self-sufficiency.' " (35 Cal.3d at p. 908, quoting *San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 115, fn. 74 (dis. opn. of Marshall, J.) [36 L.Ed.2d 16, 43, 93 S.Ct. 1278].) Finally, education provides a " 'unifying social force' " amongst the population. It promotes cohesion based upon democratic values. (35 Cal.3d at p. 908, citing *Serrano* v. *Priest, supra,* 5 Cal.3d at p. 608; *Ambach* v. *Norwick* (1979) 441 U.S. 68, 77 [60 L.Ed.2d 49, 56-57, 99 S.Ct. 1589].)

After reviewing these broad purposes of education, *Hartzell* considered two ways of interpreting the free school guarantee. First, the free school guarantee could be interpreted to include only programs " 'essential to the prescribed curriculum.' " (*Hartzell* v. *Connell, supra,* 35 Cal.3d at p. 905, citing cases.) Under this approach, the right to schooling would not include activities " 'outside of or in addition to the regular academic courses or curriculum of a school.' " (*Ibid.*) Thus, according to this view, students would *not* be entitled to engage in extracurricular activities. (*Ibid.*)

Second, the free school guarantee could be interpreted to include "all activities which constitute an 'integral fundamental part of the elementary and secondary education' or which amount to '"necessary elements of any school's activity." ' " (35 Cal.3d at p. 905.) Under this approach, the right to participate in extracurricular activities would be included within the right to attend school. (*Ibid.*)

*Hartzell* rejected the first approach. It decided the first approach placed too much emphasis upon whether a program was offered for formal academic credit, and not enough emphasis upon the broad purposes of education. For this reason, the court adopted the second approach—which "focuses not upon the formalities of credit, but upon the *educational character* of the activities in question." (35 Cal.3d at p. 909, italics added.)

Having decided which test to apply, *Hartzell* next reviewed the educational character of extracurricular activities. It found that "extracurricular activities constitute an integral component of public education." (35 Cal.3d at p. 909.) *Hartzell* noted that other states had also emphasized the important educational character of extracurricular activities. Accordingly, *Hartzell* held "that all educational activities—curricular or 'extracurricular'—offered to students by school districts fall within the free school guarantee of article IX, section 5." (*Id.* at p. 911.)

Although *Hartzell* recognized that its decision might cause school districts to stop offering extracurricular activities, the court was not dissuaded from its result. After stressing the fundamental democratic nature of education, the court explained: "Under the California Constitution, however, access to public education is a right enjoyed by all—not a commodity for sale. Educational opportunities must be provided to all students without regard to their families' ability or willingness to pay fees or request special waivers. This fundamental feature of public education is not contingent upon the inevitably fluctuating financial health of local school districts. A solution to those financial difficulties must be found elsewhere—for example, through the political process." (35 Cal.3d at p. 913.)

Recently, the California Supreme Court again examined the free school guarantee. In *Arcadia Unified School Dist.* v. *State Dept. of Education, supra,* 2 Cal.4th 251, taxpayers challenged the constitutionality of a statute authorizing charges for school-provided transportation. They claimed the statute violated the free school guarantee. The court disagreed. It held that the statute did not violate the free school guarantee because transportation is not an educational activity or an essential element of school activity. In so deciding, the court reaffirmed its decision in *Hartzell*. *Arcadia* emphasized that *Hartzell* had focused upon the "educational character" of the extracurricular activities. *Arcadia* also recognized that *Hartzell* had broadly construed the term "educational." Even so, *Arcadia* concluded that "Transportation is simply not an educational activity. It is not protected by the reasoning of *Hartzell*." (*Id.* at p. 263.)

*Arcadia* stated that "Without doubt, school-provided transportation may enhance or be useful to school activity, but it is not a necessary element which each student must utilize or be denied the opportunity to receive an education." (*Arcadia Unified School Dist.* v. *State Dept. of Education, supra,* 2 Cal.4th at p. 264.) The court also noted, "We have not yet addressed the question of whether the failure to offer bus service at all may also constitute an abuse of discretion or violate the free school or equal protection clause of

the California Constitution if children are thereby deprived of the ability to attend school. We emphasize that section 39807.5 provides that indigent students will not have to pay a fee; therefore in this facial challenge we do not anticipate that any child will be unable to attend school as a result of a proper application of section 39807.5." (*Id.* at p. 264, fn. 11.)

In *Driving Sch. Assn. of Cal.* v. *San Mateo Union High Sch. Dist.* (1992) 11 Cal.App.4th 1513 [14 Cal.Rptr.2d 908], the court held that driver training fees charged by a high school district violated the free school guarantee. In that case, a private driving school sought to prohibit a high school district from charging high school students fees for driver training classes offered in its *adult* school and to refund payments it had received. The appellate court held that the fees violated the free school guarantee.

After discussing *Hartzell*, the court concluded, "[t]he demands of citizenship have changed from those that could have been envisioned at the time the free school guarantee was enacted in the Constitutional Convention of 1878-1879. Today, in a society dependent on automotive transportation, the ability to drive safely and skillfully can reasonably be regarded as an aspect of good citizenship. The Legislature unquestionably has adopted this position by requiring courses in driver education and authorizing elective courses in driver training in all public schools. The legislative treatment of the subject obliges us to conclude that driver training is educational in character." (11 Cal.App.4th at pp. 1524-1525.)

In *Driving Sch. Assn.*, *supra*, the court recognized that driver training was an "integral component" of the public education of high school students. The court stated that driver training was closely linked to driver education, classes were offered after school hours or during spring vacation on high school premises, and classes were overwhelmingly composed of high school students. (11 Cal.App.4th at p. 1525.)

The court noted that ". . . the probable consequence of the finality of our holding would be to cause the School District either to drop driver training from the adult school curriculum or to offer classes less directly adapted to the convenience and needs of high school students. But similar anomalous consequences were probable in the *Hartzell* case. Disregarding considerations of financial expediency, the Supreme Court refused to compromise the rigorously democratic character of the free school guarantee, holding that public education must be offered equally to all and that the content of this education must reflect decisions made at the community level through the political process rather than the student's financial resources. The same principles apply here." (11 Cal.App.4th at p. 1525.)

*Hartzell*, *Arcadia*, and *Driving Sch. Assn.* convince us that the driver training fees violate the free school guarantee. Like the court in *Driving Sch. Assn.*, we agree that driver training is "educational" in character. The Legislature has stressed the importance of driver training. It has stated that "It is the intent of the Legislature that driver training instruction be provided pupils as a part of the high school curriculum . . . ." (§ 41306.) It has authorized the Superintendent of Public Schools to "promote and direct the establishment and maintenance of courses of instruction in automobile driver education and driver training in the public schools." (§ 41904.) Given these legislative pronouncements, it would be difficult to conclude that driver training is not educational in character.

Further, just as extracurricular activities promote good citizenship, so does driver training. Driver training fosters good citizenship by enabling individuals to be better equipped to participate in the political, economic, and social aspects of the community. This is particularly true in California, where the ability to drive an automobile plays an important role in all aspects of the state's culture.

Driver training is "educational" even though the Legislature has distinguished between "driver education" and "driver training." The two phrases are simply a way of distinguishing between the classroom phase of driver education, and its behind-the-wheel laboratory component. The fact that driver training takes place in the automobile, rather than in the classroom, does not mean that such training is not "educational." Regardless of the designation, during driver training, students are *taught* to drive. Moreover, when measured against *Hartzell*'s broad definition of "education," it seems plain that driver training falls within the *Hartzell* test.

Finally, this case is quite different from *Arcadia*, which involved a charge for transporting students to and from school. In that case, students were not paying to be "taught" to drive; they were merely charged a fee for transportation.

For these reasons, we hold that William S. Hart Union High School District's driver training fee violates the free school guarantee of the California Constitution.

III. *Illegal Expenditure of Funds*

■ Appellants ask that moneys be allocated from the DTPAF to reimburse them for the cost of driver's training.[10] Appellants seek to prohibit the transfer of moneys contained in the DTPAF to the General Fund of the State of California. They claim that this transfer constitutes an illegal expenditure of funds. We disagree.

Code of Civil Procedure section 526a provides, in pertinent part, "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein."

■ The primary purpose of section 526a is to permit citizens to challenge governmental action which would otherwise go unchallenged due to standing requirements. The section is liberally construed to achieve this purpose. (*Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 268 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].)

■ Taxpayer suits may be brought against a state agency or officer. (*Ahlgren* v. *Carr* (1962) 209 Cal.App.2d 248, 256 [25 Cal.Rptr. 887] [action to enjoin State Director of Finance and Controller from spending over $14 million for textbooks allegedly in violation of legislative conditions]; *Farley* v. *Cory* (1978) 78 Cal.App.3d 583, 589 [144 Cal.Rptr. 923] [action against State Controller to compel exercise of discretion to prevent loss of money due the state].)

A taxpayer suit is authorized only if the governing body has a duty to act and has refused to do so. If the governing body has discretion and decided not to act, then the court is prohibited from substituting its discretion for the discretion of the governing body. (*Silver* v. *Watson* (1972) 26 Cal.App.3d 905, 909 [103 Cal.Rptr. 576]; *TRIM, Inc.* v. *County of Monterey* (1978) 86 Cal.App.3d 539, 543 [150 Cal.Rptr. 351].)

■ In this case, appellants allege that the state had a duty to use DTPAF funds to pay driver training expenses for high school districts. In

---

[10]Appellants presumably challenge section 24.10 of chapter 587 of the Statutes of 1992 and section 24.10 of Senate Bill No. 80, amended June 30, 1993, of the 1993-1994 Regular Session of the California Legislature, both of which directed the State Controller to transfer the unencumbered balance in the DTPAF on June 30, 1993, to the State General Fund.

deciding this question, we must determine whether the statutory scheme reflects a continuing appropriation by the Legislature or whether the availability of driver training funding is subject to legislative discretion.

██ An appropriation is a legislative act setting aside "a certain sum of money for a specified object in such manner that the executive officers are authorized to use that money and no more for such specified purpose." (*Ryan* v. *Riley* (1924) 65 Cal.App. 181, 187 [223 P. 1027].) A continuous appropriation runs from year to year without the need for further authorization in the budget act.[11] (See Continuing Appropriations, 64 Ops.Cal.Atty.Gen. 809, 810-813 (1981); see Gov. Code, § 16304.)

"[T]he use of technical words in a statute is not necessary to create an appropriation." (*Ingram* v. *Colgan* (1895) 106 Cal. 113, 118 [39 P. 437].) The legislative intent determines whether a statute contains an appropriation. (*Riley* v. *Johnson* (1933) 219 Cal. 513, 519 [27 P.2d 760, 92 A.L.R. 1292].) However, since appropriating public money is a legislative, rather than a judicial, function, courts should interpret ambiguous statutory language to create an appropriation only where it is clear that the Legislature intended to make funds immediately available. (See *City & County of S.F.* v. *Kuchel* (1948) 32 Cal.2d 364, 366 [196 P.2d 545].) This is especially true for continuous appropriations. Government Code section 13340 provides that "no moneys in any fund, which, by any statute other than a Budget Act, is continuously appropriated without regard to fiscal years, may be encumbered unless the Legislature, *by statute, specifies* that the moneys in the fund are appropriated for encumbrance." (Italics added.)

██ Accordingly, we must interpret the statutory provisions to determine whether the Legislature continuously appropriated money to pay for driver training. "The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) We first examine the statutory language. If it is clear, we need look no further. This is because we generally follow the plain meaning of a statute. (*State of California* ex rel. *Van de Kamp* v. *Texaco, Inc.* (1988) 46 Cal.3d 1147, 1182 [252 Cal.Rptr. 221, 762 P.2d 385].)

Section 41304 provides in part that "subject to Section 41305, there shall be appropriated from the Driver Training Penalty Assessment Fund . . . ."

---

[11]In certain circumstances, however, the Legislature may use the budget act and the Governor may use the line-item veto in a particular year to limit the exact amount of otherwise continuously appropriated funds available for encumbrance and expenditure. (*Board etc. Commrs.* v. *Riley* (1924) 194 Cal. 37, 42-43 [227 P. 775].)

The word "shall" expresses futurity and prospective action and, in a statutory context, ordinarily reflects a legislative mandate or command. (*Fullerton Union High School Dist.* v. *Riles* (1983) 139 Cal.App.3d 369, 385 [188 Cal.Rptr. 897].) In fact, section 75 expressly provides that " '[s]hall' is mandatory."

However, usually when a continuous appropriation is enacted under Government Code section 13340, the Legislature's intent is absolutely clear. For example, Education Code section 44252.6 provides, in pertinent part, "Notwithstanding Section 13340 of the Government Code, funds reimbursed to the State Department of Education . . . are hereby continuously appropriated and available for expenditure without regard to fiscal year upon the order of the Superintendent of Public Instruction . . . ." (Cf. also §§ 23402, 89722.5; Gov. Code, §§ 8589.16, 15819, 15819.20, 16312, and 22952.)

Most importantly, section 41304 is "*subject to section 41305.*" (Italics added.) Prior to September 15, 1992, section 41305 provided that "[t]he amounts provided under Section 41304 for any fiscal year shall not exceed an amount equal to the sum of the moneys credited to the Driver Training Penalty Assessment Fund in the State Treasury during the preceding fiscal year and the amount by which the deposits in the Driver Training Penalty Assessment Fund on or after September 15, 1961, have exceeded the amounts required to reimburse the General Fund on account of transfers made after such date." (Stats. 1976, ch. 1010, § 2.)

Section 41305 was amended. It now reads, in part, that "The amounts provided under Section 41304 for any fiscal year *shall be limited to the amounts appropriated in the annual Budget Act for the purposes of that section,* . . ." This language is clear. It demonstrates that the DTPAF funds which may be used to pay for driver training are "limited to the amounts appropriated in the annual Budget Act." Thus, an annual appropriation is required before DTPAF funds can be used. The Legislature must appropriate the money in the annual Budget Act. Accordingly, the statutory scheme does not establish a continuous appropriation.

Nor can we impose any duty upon the Legislature to appropriate the money in the annual Budget Act. "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.) "Money may be drawn from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant." (Cal. Const., art. XVI, § 7.) Appropriating moneys is a legislative function. (Cal. Const., art. IV, §§ 1; 12.)

■ Courts are prohibited "from directly ordering the Legislature to enact a specific appropriation." (*Mandel* v. *Myers* (1981) 29 Cal.3d 531, 540 [174 Cal.Rptr. 841, 629 P.2d 935]; see also *City of Sacramento* v. *California State Legislature* (1986) 187 Cal.App.3d 393, 396-397 [231 Cal.Rptr. 686].)

"It is within the legitimate power of the judiciary, to declare the *action* of the Legislature unconstitutional, where that action exceeds the limits of the supreme law; but the Courts have no means, and no power, to avoid the effects of *non-action*. The Legislature being the creative element in the system, its action cannot be quickened by other departments. Therefore, when the Legislature fails to make an appropriation, we cannot remedy that evil. It is a discretion specially confided by the Constitution to the body possessing the power of taxation." (*Myers* v. *English* (1858) 9 Cal. 341, 349.)

■ For these reasons, transferring the DTPAF funds into the General Fund, instead of using the funds to pay for driver training, is not an illegal expenditure of funds. (Code Civ. Proc., § 526a.) Section 41305 expressly makes the availability of DTPAF funds limited to the amount appropriated in the annual Budget Act.

## IV. *Breach of Contract*

■ Appellants contend the state breached its contractual obligation to reimburse the school districts for driver training expenses. In so doing, appellants argue the state violated the United States and California Constitutional provisions barring passage of laws that impair the obligations of contract.

Article I, section 10 of the United States Constitution provides, in pertinent part, "No State shall . . . pass any . . . Law impairing the obligation of Contracts[.]" Article I, section 9 of the California Constitution provides, in pertinent part, "A . . . law impairing the obligation of contracts may not be passed."

"In California law, a legislative intent to grant contractual rights can be implied from a statute if it contains an unambiguous element of exchange of consideration by a private party for consideration offered by the state." (*California Teachers Assn.* v. *Cory* (1984) 155 Cal.App.3d 494, 505 [202 Cal.Rptr. 611]; see *Valdes* v. *Cory* (1983) 139 Cal.App.3d 773, 785-787 [189 Cal.Rptr. 212], italics added.) In *California Teachers Assn.* v. *Cory* the court stated that "[u]nder ordinary principles of contract law a bargain may be sealed by performance with knowledge of the offer." (*Id.* at p. 507.)

Appellants contend that section 41304 constitutes a legislative offer to pay. As aleady noted, section 41304 is subject to section 41305. Section

41305 requires that "The amounts provided under Section 41304 for any fiscal year *shall be limited to the amounts appropriated in the annual Budget Act for the purposes of that section, . . .*" (Italics added.) Thus, it is clear that section 41304 simply cannot be interpreted as a legislative promise to pay. Section 41305 gives clear notice to school districts that money for driver training under section 41304 shall be limited to amounts appropriated in the annual Budget Act. Thus, it is obvious that under the current version of section 41305 there is no promise to reimburse school districts for money spent on driver training. Moreover, the district did not act in reliance upon any alleged legislative promise to pay. Driver training was not offered to students without charge, with the expectation that the expenses would be reimbursed. Since section 41304 is contingent upon a legislative appropriation, it is plainly not an *"unambiguous element of exchange of consideration by a private party for consideration offered by the state."* (*California Teachers Assn.* v. *Cory, supra,* 155 Cal.App.3d 494, 505.)

## V. *Trust*

 Appellants contend that the DTPAF constitutes a trust fund that can only be used to reimburse them for driver training costs. We conclude this contention is without merit.

The applicable statutes do not expressly create a trust fund, designate a trustee to administer it, or establish rules to govern its administration. (Compare §§ 22300, 70038, 89722 with Unemp. Ins. Code, §§ 3001-3002.) Nor do these statutes or their history indicate that money in the Fund is held in trust, devoted exclusively to driver training reimbursement or not available for any other purpose. (See Gov. Code, § 16305.3.)

Cases in which courts have deemed money in special funds to be in the nature of trust funds are distinguishable. Generally, they involve statutes that create state agencies that the Legislature intends to be self-sufficient. To this end, the agencies are authorized to collect and immediately spend the money they collect. Often the Legislature expressly devotes this money to the agencies' support. (See, e.g., *Riley* v. *Forbes* (1924) 193 Cal. 740, 744 [227 P. 768]; *Riley* v. *Thompson* (1924) 193 Cal. 773 [227 P. 772]; *Daugherty* v. *Riley* (1934) 1 Cal.2d 298 [34 P.2d 1005]; see 19 Ops.Cal.Atty.Gen. 220 (1952).) Here, section 41304 and section 41305 expressly interpose the Legislature between the fund and school districts and require an appropriation. Because the money appropriated from the DTPAF under section 41304 is limited to amounts appropriated in the annual Budget Act, it cannot be considered a trust fund.

## VI. *Equal Protection*

Appellants argue that the state has violated equal protection by collecting penalties from traffic violators and distributing the fund to all the other programs but not to the DTPAF. We reject this contention.

The Fourteenth Amendment of the United States Constitution prohibits states from denying to "any *person* within its jurisdiction the equal protection of the laws." (Italics added.) Article I, section 7, subdivision (a) provides in pertinent part that "[a] *person* may not be . . . denied equal protection of the laws . . . ." (Italics added.)

The equal protection clause applies to persons, including aliens, and to corporations. (*Yick Wo* v. *Hopkins* (1886) 118 U.S. 356, 360 [30 L.Ed. 220, 222, 6 S.Ct. 1064]; *Gulf, Colorado & Santa Fe R'y* v. *Ellis* (1897) 165 U.S. 150 [41 L.Ed. 666, 17 S.Ct. 255].) The DTPAF is not a person. Nor is it a corporation. For this reason, the equal protection argument is without merit.

Even if the equal protection clause could somehow be applied to the DTPAF, appellants' basic premise is incorrect. The DTPAF *does* receive the funds. Once a month, a certain percentage of moneys deposited in the State Penalty Fund is transferred to the DTPAF. (Pen. Code, § 1464, subd. (f)(4).) Thus, the claim that the money is transferred to the other funds, but not to the DTPAF, is simply incorrect.

Nor is equal protection violated because the school districts (the proposed recipients of DTPAF moneys) did not receive the money while the other funds presumably did. The school districts are not similarly situated with the other fund recipients, other than the fact that each receives moneys from the State Penalty Fund. Each recipient receives different amounts from the State Penalty Fund. Each recipient receives the money for a different purpose. Penal Code section 1464, subdivision (f) treats differently the available use of the recipients' funds. For example, money transferred into the Fish and Game Preservation Fund "shall be used for the education or training of department employees which fulfills a need consistent with the objectives of the Department of Fish and Game." (Pen. Code, § 1464, subd. (f)(1).) Money transferred to the Restitution Fund "shall be made available in accordance with subdivision (b) of Section 13967 of the Government Code." (Pen. Code, § 1464, subd. (f)(2).) Penal Code section 1464, subdivision (f)(4) does not describe how the DTPAF moneys should be used. It simply orders a certain percentage of money from the State Penalty Fund to be deposited into the DTPAF. Section 41304 provides that the money in the DTPAF "shall be appropriated" to reimburse school districts for the costs of

driver training, subject to section 41305. Section 41305 limits the amounts which shall be appropriated to the "amounts appropriated in the annual Budget Act." Accordingly, it is absolutely clear that the legislative treatment of each of these funds is different. They are plainly not similarly situated.[12]

Appellants also suggest that equal protection is violated because some school districts provide free driver training and others do not. We are unable to review this claim. It was not considered by the trial court. Further, there is nothing in the record to indicate which school districts provide driver training, which provide driver training only for a fee, and which school districts provide no driver training at all. Accordingly, we lack an adequate factual basis to review the merits of this contention.

### Conclusion

We hold that high school districts violate the free school clause when they charge students for driver training. We also hold that DTPAF funds may be used to pay for driver training only if there is an appropriation in the annual Budget Act. (§ 41305.) We affirm the trial court's denial of appellants' petition for a writ of mandamus and preliminary injunction.

Cottle, P. J., and Bamattre-Manoukian, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 23, 1995.

---

[12]The claim that Vehicle Code violators, such as Franklin Hall, are denied equal protection because a portion of their fines were not used to pay for driver training, is without merit. Section 41305 provides that the money appropriated under section 41304, shall be limited to amounts appropriated in the annual Budget Act. Given this limit, appellants can have no right to have their fine distributed a particular way.