[Civ. No. 10323. Third Dist. Nov. 5, 1962.]

RALPH B. AHLGREN et al., Plaintiffs and Appellants, v. JOHN E. CARR, as Director of Finance, et al., Defendants and Respondents.

Landis & Martin, Thomas W. Martin and Lally, Martin & Luce for Plaintiffs and Appellants.

Stanley Mosk, Attorney General, and Richard L. Mayers, Deputy Attorney General, for Defendants and Respondents.

SCHOTTKY, J.—This is an appeal from a judgment of dismissal entered after respondents' demurrer was sustained without leave to amend.

We granted a rehearing in this case in order that we might finally resolve the important issues presented. We gave the parties the opportunity to present any documents to this court which they desired judicially noticed. They were afforded an opportunity to present any information which might bear on

the propriety of judicial notice, the facts of the matter to be noticed, and to fully reargue the matter before this court.

Plaintiffs, as taxpayers and citizens of the State of California, brought this action to enjoin John E. Carr, as Director of Finance of the State of California, and Alan Cranston, as Controller of the State of California, from taking action which would result in alleged illegal expenditures of state funds. The action involves the legality of the action of the Director of Finance in approving contracts between the state and certain textbook publishers for the purchase of textbooks for the schools and the legality of the disbursements of funds by the Controller in payment of the purchase price of the books.

On March 10, 1960, the Board of Education of the State of California approved the purchase of certain textbooks at a total cost of over fourteen million dollars. Thereafter, the Legislature appropriated a sum to purchase such books but provided in item 361 of the Budget Act as follows: ''[N]one of this appropriation shall be available to finance contracts in respect to the new textbooks adoptions set forth on page 956 of the Governor's Budget for the 1960-1961 fiscal year in which the unit price for any textbook or the total price for any series of textbooks submitted on a finished book basis exceeds by more than 10 percent, respectively, the average of the three highest unit prices for a competitive textbook or the average of the three highest total prices for a competitive series of textbooks submitted on the basis of leasing plates to the State.''

The foregoing provision was adopted on the recommendation of a Legislative Conference Committee which reported to the Legislature as follows:

''[R]ecommended the inclusion in Item 361 of respective language designed to insure that textbooks purchased by the State shall be available at reasonable and competitive prices. It is not intended to interfere with the State Board of Education's discretion to adopt and select textbooks.

''The language contained in Item 361 will permit the State Board to contract for the purchase of finished textbooks or the printing and binding of books using leased plates so long as the contract price for finished textbooks does not exceed by more than 10 percent the cost of the highest priced competitive textbooks submitted on the basis of leasing plates to the State.

''The Legislature has not been furnished comparative cost data which would show an adequate basis for the substantial

difference in price between the amount budgeted for state textbooks under policies followed heretofore and the amount needed for the purchase of finished textbooks. This makes necessary the imposition of a reasonable ceiling on prices to conserve the financial interests of the State and to prevent improvidence, and the language of Item 361 is designed to serve this purpose.''

After this legislation was enacted the State Board of Education approved proposed contracts for the purchase of finished textbooks. Two contracts were submitted to the Director of Finance for his approval. This action was filed on August 1, 1960. The basic theory of the complaint was that the contracts as written exceeded the legislative limitation on such contracts. The complaint contained two causes of action. The first cause of action was to enjoin the officials as has been previously indicated. The second alleged that the adoption of the books as textbooks for use in the public schools did not comply with the law and that the contracts based on such adoptions did not comply with the law and that the contracts based on such adoptions were illegal.

The demurrer as to each count filed by the Attorney General on behalf of John Carr and Alan Cranston was on the ground that the complaint did not state facts sufficient to constitute a cause of action.

The demurrer raised the following points:

1. The standing of the plaintiffs to sue;

2. Whether the action was one against the officers in their official capacity or against the state itself, to which the state had not consented;

3. Whether the second cause of action stated sufficient facts to constitute a cause of action; and

4. Whether facts of which this court may take judicial notice demonstrate conclusively that the three contracts challenged by plaintiffs were lawful and complied with the provisions of item 361 of the Budget Act of 1960-1961.

The learned trial judge in his ''Memorandum Opinion'' stated that the crucial question in the case was whether or not a taxpayer as such had the right to maintain an action to enjoin allegedly improper expenditures of public funds by a state official. The court concluded that ''the better rule and the one to which California in my judgment is committed, is that 'a taxpayer has no standing as such to have the officers of the State enjoined from wasting public funds.' (*Mitchell* v. *Stephens* (S.D. Cal.) 285 F. 756. . . .'' The court then

stated that "In view of my holding as indicated above, I do not think it necessary to discuss other points made by the parties."

The question whether a taxpayer has a sufficient interest to maintain an action against state officers to enjoin allegedly improper expenditures has never been directly decided in California though actions have been brought by taxpayers and have proceeded through the trial and appellate courts without that question being raised. (See *Livermore* v. *Waite,* 102 Cal. 113 [36 P. 424, 25 L.R.A. 312]; *Wheeler* v. *Herbert,* 152 Cal. 224 [92 P. 353]; *Holloway* v. *Purcell,* 35 Cal.2d 220, 222 [217 P.2d 665].)

While there seems to be a conflict of authority as to whether a taxpayer has the right to enjoin an illegal expenditure by a state official, we believe that the great weight of authority suggests the rule that the taxpayer does have such right.

In a very complete and informative annotation it is stated in 58 American Law Reports 588, at page 589: "In a majority of the jurisdictions in which the question of the right of a taxpayer and citizen to enjoin a waste or unlawful expenditure of state funds has been raised, that right has been upheld." And at page 599: ". . . [T]he real basis of the rule permitting suit by the individual taxpayer is the necessity of prompt action to prevent irremediable public injury; this reason applies equally as well where state funds are being misappropriated, and if jurisdiction can be sustained in one case it should be in the other, just as the majority of courts hold that it can be. The municipal or county taxpayer is allowed to maintain the suit, not because of an individual interest differing from other taxpayers, but because as such taxpayer he is so interested in the municipal funds that he may ask the court to protect them from misuse or misappropriation; the taxpayer bears the same relation to the state funds as to the municipal funds, except in degree, a point which should not enter into the question."

And in 52 American Jurisprudence it is stated at page 4: "[A]s a general rule, when the question of the right of a taxpayer and citizen to enjoin a waste or unlawful expenditure of state funds has been raised, that right has been upheld."

In 3 Davis, Administrative Law Treatise, section 22.09, at page 245, the author points out that a 1929 collection of cases showed nineteen states which at that time held that state taxpayers could challenge state expenditures and only four that denied such right. Davis observed however that at the present

time "probably at least thirty-two states uphold the standing of state taxpayers, and in not a single state is the law clear that state taxpayers have no standing to challenge state expenditures. This means that since 1929, about thirteen states have for the first time upheld such standing, and that each of the four states which previously had denied such standing has developed law which either upholds such standing or makes standing unclear."

The rationale of the overwhelming acceptance of the principle of the right of a state taxpayer to maintain a suit to enjoin the illegal expenditure of state funds is set forth in a law review comment in 50 Harvard Law Review 1276, 1283, as follows: "The taxpayers' suit must then be understood as not only a means of vindicating individual rights but as a governmental device to safeguard the legal restrictions on state and local governments, which, if not subjected to the careful scrutiny of individual taxpayers, might well become dead letters. The importance of the latter factor is indicated by the enactment of statutes allowing such suits in those jurisdictions in which judicial interpretation of ordinary legal principles had denied the taxpayer's status to sue. The overwhelming acceptance of such suits is in keeping with the distrust of executive and administrative self-restraint in the use of the spending power and with the readiness to allow the courts to assume the role of arbiter in the governmental scheme."

In the very recent case of *Gogerty* v. *Coachella Valley Junior College Dist.*, 57 Cal.2d 727 [21 Cal.Rptr. 806, 371 P.2d 582], which was an action by a taxpayer to have the selection and acquisition of a school site declared void and that defendant district be permanently enjoined from acquiring or developing the site with public funds, our Supreme Court reversed a judgment predicated upon the sustaining of a demurrer to plaintiff's fourth amended complaint without leave to amend. The court said at page 730: "A taxpayer may sue a governmental body in a representative capacity in cases involving fraud, collusion, ultra vires, or failure on the part of the governmental body to perform a duty specifically enjoined. (*Silver* v. *City of Los Angeles, ante,* pp. 39, 40-41 [1] [17 Cal.Rptr. 379, 366 P.2d 651]; *Nickerson* v. *County of San Bernardino,* 179 Cal. 518, 522 et seq. [177 P. 465]; *Dunn* v. *Long Beach L. & W. Co.,* 114 Cal. 605, 609 [46 P. 607]; *Schaefer* v. *Berinstein,* 140 Cal.App.2d 278, 289 [12] [295 P.2d 113]; *Pratt* v. *Security Trust & Savings Bank,* 15 Cal.

App.2d 630, 636 [1] [59 P.2d 862]; 18 McQuillin, Municipal Corporations (3d ed. 1950) sec. 52.07, p. 23; cf. 124 A.L.R. (1940) pp. 1238-1340.) ''

The case of *Mitchell* v. *Stephens, supra,* (285 F. 756) which was relied on by the trial court and by respondents is clearly distinguishable from the case at bench. In that case a California taxpayer sought to recover on behalf of the state the loss resulting from the sale of certain bonds in violation of a constitutional amendment. Even though the court conceded that the sale was ultra vires and void, it nevertheless held that plaintiff as a California taxpayer, as distinguished from a taxpayer of a city or county, had no standing ''to bring a suit in attempted and asserted enforcement of a claim or demand inuring to the state itself, . . .''

In the instant case the action is not brought to enforce a claim inuring to the state itself but is one in which the taxpayer seeks to enjoin alleged illegal expenditures by state officials.

Likewise, the case of *Elliott* v. *Superior Court,* 180 Cal. App.2d 894 [5 Cal.Rptr. 116], cited by respondents is distinguishable from the case at bench. In that case this court held that a taxpayer could not maintain an action for damages for the benefit of the state against defendants because of allegedly unlawful practices in the operation of a gas field. This court stated that the matter had been called to the attention of the proper state officials and they refused to join in the action and that in the absence of a proper showing of fraud or bad faith in refusing to join in the action it could not circumvent their decision.

 Having concluded that the great weight of authority supports the right of a taxpayer to bring an action to enjoin the alleged illegal expenditure of public moneys by a state official, we believe the trial court erred in holding that a taxpayer had no right to maintain the instant action.

The second question is whether the action is one against the officers of the state in their official capacity or against the state itself to which the state has not assented. The answer is aptly stated in *Rein* v. *Johnson,* 149 Neb. 67 [30 N.W.2d 548, 551-552]:

''Generally, the applicable rule is that an action against state officers, attacking the constitutionality of a statute of the state and seeking to enjoin its enforcement by such officers, or otherwise obtain relief from an alleged invalid act or abuse of

authority by them is not ordinarily a suit against the state, and is not prohibited as such under the general principles governing the immunity of the state from suit. That is true because acts of state officers not legally authorized, or which exceed or abuse the authority conferred upon them, are judicially regarded as their own acts and not acts of the state. 49 Am.Jur., States, Territories, and Dependencies, § 94, p. 307, § 95, p. 310; 59 C.J., States, § 465, p. 310; 43 C.J.S., Injunctions, § 109, p. 626; 32 C.J., Injunctions, § 389, p. 247.

"As stated in *Burke* v. *Snively*, 208 Ill. 328 [70 N.E. 327, 328]: 'In equity the money in the state treasury is the money of the people of the state, and suits by a taxpayer to restrain the misappropriation by public officers of such money to an unauthorized purpose are not suits against the state.'

"Also, as stated in *White Eagle Oil & Refining Co.* v. *Gunderson*, 48 S.D. 608 [208 N.W. 614, 617, 43 A.L.R. 397], quoting with approval from *Mullen & Rouke* v. *Dwight et al., Regents of Education*, 42 S.D. 171 [173 N.W. 645]: 'Likewise, state officials may be restrained or prohibited by appropriate action or procedure, in any court having jurisdiction, from performing unlawful acts as such officials, without the consent of the state, as such procedure is not deemed a suit against the state.' "

Respondents' next point in support of their demurrer is that "IN ANY EVENT, THE DOCUMENTS IN THE FILES OF THE STATE BOARD OF EDUCATION, WHICH WERE FURNISHED TO THE TRIAL COURT, ARE SUBJECT TO JUDICIAL NOTICE. THEY DEMONSTRATE THAT THE COMPLAINT DOES NOT STATE A CAUSE OF ACTION."

Appellants' complaint is based upon the allegation that the textbook contracts violate the provisions of the 1960 Budget Act and that the payments to the publishers under these contracts are illegal expenditures. In Paragraph XII of the first cause of action plaintiffs allege facts setting forth eight specific grounds that the Director of Finance violated the Budget Act of 1960 in approving the textbook contracts. The issue presented by this pleading is whether or not these acts violated the Budget Act of 1960.

Respondents request this court to take judicial notice of certain facts stated in a number of exhibits filed in the trial court with the demurrer, and they assert that they demonstrate conclusively that the contracts are lawful and comply with the Budget Act.

Before discussing the question of judicial notice, it is necessary to determine what the Legislature meant when it enacted item 361 of the Budget Act of 1960-1961. The clue to the meaning of limitation is found in the report of the Legislative Conference Committee. This report indicates that the committee was concerned with the difference in the cost to the state of books furnished on a leased-plate basis and those furnished on a finished basis. The report also shows that the committee had not been furnished comparative cost figures to explain the substantial difference. Finally, it shows the purpose of the limitation, namely, the imposition of a reasonable price limitation to conserve the financial interest of the state and to prevent improvidence.

It first is clear that the Legislature was only attempting to set a price limitation on the amount that could be spent for textbooks. It could not do more in this regard. (*State Board of Education* v. *Levit*, 52 Cal.2d 441 [343 P.2d 8].) The limitation is that the price to be paid not exceed by more than 10 per cent the cost of the highest priced competitive textbooks submitted on the basis of leasing plates to the state.

From the complaint on file it is evident that a bid had been submitted as to the cost of printing textbooks on a leased-plate basis. The complaint challenges the computation of certain items of cost. It does not state that the contracts as accepted were not within the 10 per cent limitation. Implied in the report accompanying item 361 of the Budget Act is the fact that the Legislature had certain costs before it. The legislative committee stated that comparative cost data was not before it to show an adequate basis for the difference in price between the amount budgeted for state textbooks under policies followed heretofore and the amount needed for finished textbooks. If the committee had costs of state printed textbooks before it, then it is clear that the budget provision was enacted with the state printed textbook cost as the standard. Exhibit VII prepared by the State Board of Education which is the estimated cost of furnishing reading textbooks submitted for state adoption states in part: ''Data on estimated cost of manufacturing those books on which publishers submitted bids on the basis of furnishing reproduction materials and payment by the State of royalty for the right to publish and distribute were supplied to the Department of Education by the State Printer. The estimated costs of manufacturing were based on manufacturing, from July, 1960 through August, 1961, with equipment presently in the State

Printing Plant. In preparing the estimates, the State Printer used present costs of labor and material plus a 5 per cent allowance for possible increases (in contrast with a 10 per cent allowance used in previous estimates). The estimates include a 6 per cent allowance for spoilage (in contrast with a 10 per cent allowance for this item in previous estimates).''

This report contains cost breakdowns of the printing of textbooks by the State Printer. With this knowledge, the meaning of item 361 becomes clear. There were no comparative cost breakdowns for the finished books purchased from the publisher though the price of finished books was shown. The Legislature had a computation as to the cost of leased-plate books. Since there were no comparative cost figures, the Legislature could not ascertain if the price differential were reasonable. It could only impose a reasonable limitation in the manner in which it did by requiring that the cost of finished books not exceed by over 10 per cent the cost submitted to it of state printed books.

It is clear that the Legislature's thought was that the price of the finished books was too high, and it restricted the prices that could be paid for each series of finished books.

 It is asserted by the plaintiffs in this action that this document was before the Legislature. Having conceded this point, no cause of action can be stated in the complaint. Whether the State Printer can revise his costs becomes immaterial. Whether certain items were improperly included as costs makes no difference. The Legislature could not have meant that the question of costs was to be recomputed over and over again. If so, one would get on a merry-go-round with no clue as to when the carousel should stop or how one would get off. The Legislature could only have meant that the leased-plate costs as submitted were to be the base on which the 10 per cent differential was to be computed.

It is only if the contracts as awarded exceeded the submitted prices by over 10 per cent that a cause of action could be stated. No such contention has been made. Accordingly, the ruling on the demurrer was correct.

 Even if Exhibit VII were not before this court, this court could take judicial notice that such report had been prepared. This court has the same power to take judicial notice as a trial court. (Witkin, Cal. Evidence, Judicial Notice, § 42, p. 56.) Subdivision 3 of section 1875 of the Code of Civil Procedure states that courts take judicial notice of the existence of the records of the State Board of Education.

(*Watson* v. *Los Altos School Dist.*, 149 Cal.App.2d 768 [308 P.2d 872].)

No other points require discussion.

In view of the foregoing, the judgment is affirmed.

Peek, P. J., and Pierce, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 3, 1963. Peek, J., did not participate therein.