[No. B094962. Second Dist., Div. Four. Oct. 17, 1996.]

MICHAEL CORNELIUS, Plaintiff and Respondent, v.
LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION
AUTHORITY et al., Defendants and Appellants.

1762

**COUNSEL**

De Witt W. Clinton, County Counsel, and Richard P. Shastang, Deputy County Counsel, for Defendants and Appellants.

Janet Reno, United States Attorney General, Lisa H. Macphee and Deval L. Patrick, United States Assistant Attorneys General, Isabelle Katz Pinzler, United States Deputy Assistant Attorney General, Louise H. Renne, City Attorney (San Francisco), Mara E. Rosales, Nancy E. McFadden, Paul M. Geier, Trudy B. Levy, David K. Flynn and Lisa W. Edwards as Amici Curiae on behalf of Defendants and Appellants.

Anthony T. Caso, Sharon L. Browne, Robert J. Corry, Jones, Mahoney, Brayton & Soll and Paul M. Mahoney for Plaintiff and Respondent.

## Opinion

## VOGEL (C. S.), P. J.—

### Introduction

This lawsuit involves a constitutional challenge to an affirmative action program implemented by the Los Angeles County Metropolitan Transportation Authority. Relying upon recent precedent from the United States Supreme Court, the trial court found that the individual initiating the lawsuit had standing to raise the constitutional claim and that the challenged program did not pass constitutional muster. The court entered an injunction barring further implementation of the program and awarded the plaintiff attorney fees. We issued a writ of supersedeas to stay enforcement of the injunction pending resolution of this appeal. We now reverse because we find that the plaintiff lacked standing, either as an individual injured by the program or as a taxpayer, to challenge the program.

### Factual and Procedural Background

The lawsuit was initiated by Michael Cornelius (Cornelius), a licensed engineer. The defendants are the Los Angeles County Metropolitan Transportation Authority and its chief executive officer[1] (collectively MTA). The action challenges the Disadvantaged Business Enterprise Program (DBE program), a program with which MTA must comply in order to receive federal funds.

### The DBE Program

A DBE is defined as a small business concern at least 51 percent owned and controlled by one or more socially and economically disadvantaged persons. Racial minorities and women are rebuttably presumed to be socially and economically disadvantaged.

Federal regulations mandate that at least 10 percent of the MTA contracts be awarded to DBE's. The regulations also require the MTA to establish goals for DBE participation on specific prime contracts that have subcontracting opportunities. A prime contractor who is unable to meet a contract goal is still eligible to be awarded the prime contract if it can show good faith efforts to meet the goal.

---

[1] When the lawsuit commenced, the chief executive officer was Franklin White. During the pendency of the action, he was terminated and Joseph Drew was appointed to the position.

*Factual Background to This Case*

The trial court's ruling arose in context of a summary judgment proceeding. The issues were defined by Cornelius's third amended complaint. However, some background information is helpful to understand the problem raised by the question of standing.

Cornelius, a licensed engineer, had worked for Wagner Construction (Wagner). Wagner was a subcontractor on a bid submitted by PCL Construction Services, Inc. (PCL) to build the Metro Red Line Station at Hollywood Boulevard and Western Avenue. PCL submitted the lowest bid. However, MTA did *not* award the bid to PCL because PCL had not achieved the required DBE commitment and had not established good faith efforts to meet that goal. Accordingly, MTA awarded the job to the second lowest bidder.

Thereafter, PCL filed suit against MTA, contending the DBE program was unconstitutional. However, for reasons not stated in the record, PCL dismissed its action several days before a scheduled hearing.

Three weeks later, Cornelius filed the present action for injunctive relief raising the same grounds as PCL.

While the case was pending in the trial court, the United States Supreme Court rendered its opinion in *Adarand Constructors, Inc.* v. *Pena* (1995) 515 U.S. __ [132 L.Ed.2d 158, 115 S.Ct. 2097] (*Adarand*) in which it definitively resolved the standard by which courts would evaluate *federal* programs designed to help racial minorities. Essentially adopting the standard set forth earlier in *Richmond* v. *J. A. Croson Co.* (1989) 488 U.S. 469 [102 L.Ed.2d 854, 109 S.Ct. 706] to evaluate equivalent *state* programs, the court held that the program will be subject to strict judicial scrutiny; that the government must demonstrate a compelling interest for the program (e.g., a pattern of past discrimination); and that the program must be narrowly tailored. The *Adarand* court did not pass on the program in issue in that case but, recognizing that its decision "alter[ed] the playing field in some important respect," remanded the case for further proceedings.

In this case, MTA's efforts to defend the DBE program as implemented by it were unsuccessful. The trial court found that some of MTA's evidence was a study done after the challenged program had been initiated and therefore could not be used to justify it. The court also found the remaining evidence was merely anecdotal and insufficient and that Cornelius's objections to the evidence were "rightful" because the evidence was "responsive to Cornelius's discovery taken long before these summary judgment motions were

filed, yet [MTA] failed to produce them or even acknowledge their existence."

In August 1995, the trial court ultimately issued the following injunction: "1. Defendant Los Angeles County Metropolitan Transit Authority's Disadvantaged Business Enterprise program is unconstitutional, and is a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and Article I, Section 7(b), of the California Constitution. [¶] 2. [MTA is ] permanently enjoined and restrained from any and all of the following acts: [¶] a. Administering, enforcing, soliciting bids, or allocating any funds under the Disadvantaged Business Enterprise program. This injunction does not preclude allocating funds or paying obligations under contracts entered prior to the effective date of this injunction. [¶] b. Awarding or disbursing public contracts pursuant to the DBE program, including contracts currently pending award now. No contractor shall be required to be certified under the DBE program."

In a subsequent hearing, the trial court awarded Cornelius $97,230.50 in attorney fees. (Code Civ. Proc., § 1021.5.)

MTA filed a notice of appeal and a petition for a writ of supersedeas to stay enforcement of the trial court's injunction. MTA urged that compliance with the judgment would result in the loss of $60 million in federal funds because it could no longer meet federal DBE requirements. After receiving thorough briefing from the parties, this division issued the writ of supersedeas in December 1995. (The California Supreme Court rebuffed Cornelius's attempt to overturn the decision to issue the writ.)

On this appeal,[2] MTA contends that Cornelius lacks standing; that the trial court's decision on the merits was incorrect; and that the trial court abused its discretion in awarding attorney fees to Cornelius. To support its contention that the DBE program does not violate equal protection, MTA has tendered a study adopted by the MTA in April 1996—eight months after the trial court granted summary judgment—which it urges contains "the firm basis in evidence" to show a compelling state interest for the DBE program. Citing Code of Civil Procedure section 909 and rule 23 of the California Rules of Court, MTA requests this court to make the requisite factual determinations. Additionally, the Department of Transportation, pursuant to this court's request, has submitted an extensive and thorough brief on the merits.

---

[2]After MTA filed an appeal from the order awarding Cornelius attorney fees, we granted MTA's motion to consolidate the two appeals.

## DISCUSSION

In the trial court, Cornelius alleged two separate grounds of standing. The first was that he was an individual directly injured by the program he was attacking. The second was that he had standing, pursuant to Code of Civil Procedure section 526a, as a taxpayer. Each ground will be analyzed separately.

### A. *Standing as an Injured Party*

*Facts*

To establish that he had been injured by the MTA's contracting policies, Cornelius submitted a declaration which alleged that he was a licensed civil engineer who has "been an employer, employee, subcontractor, businessman, and taxpayer." He further alleged: "I was the vice president of operations at Wagner Construction until January, 1994, a general contractor specializing in bulk-heading, under-pitting, [caisson] drilling, piling, and sheeting. Wagner Construction specialized in public contracting work, specifically of the type administered by the Los Angeles County Metropolitan Transportation Authority. [¶] 5. I was an independent contractor from January to August, 1994, again specializing in public contracting work, specifically of the type administered by the Los Angeles County Metropolitan Transportation Authority. [¶] 6. I am now employed as a civil engineer at Malcolm Drilling, specializing in underground earth retaining systems, specifically on contracts of the type administered by MTA. [¶] 7. I am fully capable of bidding on MTA projects. I am fully capable of performing work on MTA projects. I wish to compete equally for MTA contracts in the future. In competing for MTA contracts, I desire MTA to consider my qualifications as an engineer, not my race or gender. [¶] 8. My firm, Malcolm Drilling, is fully capable of bidding on MTA projects. My firm is fully capable of performing work on MTA projects. My firm wishes to bid on MTA projects now and in the future. [¶] 9. . . . . [M]y firms have bid on MTA contracts in the past. [¶] 10. In my former consulting status, I was fully capable of performing work on MTA projects. My former clients wished to bid on MTA projects but could not compete equally because of the DBE program. [¶] 11. My former firm, Wagner Construction, was fully capable of bidding on MTA projects. My former firm, Wagner Construction, was fully capable of performing work on MTA projects. My former firm, Wagner Construction, wished to bid on MTA projects but could not compete equally because of the DBE program. [¶] 12. I cannot compete equally for MTA projects because of MTA's disadvantaged business program (DBE), which discriminates against citizens based on their race and gender. Neither I nor my firm

is certified by MTA as a DBE. Under MTA rules, I will never be able to compete for MTA projects."

The other evidence offered by Cornelius was his deposition testimony that Wagner Construction had "bid on every single subway station that they have on the red line."

At various times during the summary judgment litigation, Cornelius attempted to rely upon the allegations in his verified complaints to establish standing. That approach was, of course, improper. ■ "It is generally understood . . . that a party cannot rely on the allegations of his own pleadings, even if verified, to make or supplement the evidentiary showing required in the summary judgment context. [Citations.]" (*College Hospital Inc.* v. *Superior Court* (1994) 8 Cal.4th 704, 720, fn. 7 [34 Cal.Rptr.2d 898, 882 P.2d 894].)

*Case Law on Standing*

In *Northeastern Fla. Chapter Associated Gen. Contractors of America* v. *Jacksonville* (1993) 508 U.S. 656 [124 L.Ed.2d 586, 113 S.Ct. 2297], the United States Supreme Court addressed the issue of the standing of an *association of contractors* to challenge a local ordinance according preferential treatment to some minority-owned businesses in the award of city contracts. Reviewing precedent on the issue, the court distilled the following principle: "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. . . . [I]n the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract. . . . To establish standing, therefore, a party challenging a set-aside program . . . need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." (*Id.* at p. 666 [124 L.Ed.2d at pp. 597-598, 113 S.Ct. at p. 2303], fn. omitted.)

■ Two years later, in *Adarand*, the United States Supreme Court directly addressed the issue of an *individual contractor*'s standing to mount a constitutional challenge to a federal program. When a party, such as Cornelius, seeks "forward-looking-relief"—a permanent injunction prohibiting

further implementation of the challenged program—the party is required to show " 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.' " (515 U.S. at p. __ [132 L.Ed.2d at p. 171, 115 S.Ct. at p. 2104], quoting from *Los Angeles* v. *Lyons* (1983) 461 U.S. 95, 105 [75 L.Ed.2d 675, 686, 103 S.Ct. 1660].)

The element of concrete and particularized injury is satisfied by Cornelius's claim that the DBE program denies equal protection of the law. (*Adarand, supra,* 515 U.S. at p. __ [132 L.Ed.2d at pp. 170-171, 115 S.Ct. at p. 2104].)

The element of an actual or imminent injury is, for reasons we shall explain, lacking in this case. That element does *not* require a showing that Cornelius either has been or will be a low bidder on a government contract. (*Adarand, supra,* 515 U.S. at p. __ [132 L.Ed.2d at pp. 171-172, 115 S.Ct. at p. 2105].) Instead, it requires a showing that the injury is "certainly impending." (*Ibid.*) In *Adarand*, the court found that standing had been established based upon the following facts. There, the plaintiff (Adarand) was a Colorado subcontractor who submitted the low bid for the guardrail portion of a federal highway construction project. The general contractor awarded the bid to another subcontractor (Gonzales) solely because the general contractor received additional compensation from the federal government for hiring a subcontractor who, pursuant to the challenged statute, was presumed to be socially and economically disadvantaged. The court held that the dispositive inquiry was "whether Adarand has made an adequate showing that sometime in the relatively near future it will bid on another government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors." (*Ibid.*) The facts marshaled by Adarand to make that showing included deposition testimony from its general manager that Adarand bid on every guardrail project in Colorado and documentary evidence that the federal government, on an average yearly basis, let one and a half road contracts which included guardrail work between 1983 and 1990. The court concluded: "Because the evidence in this case indicates that the [federal government] is likely to let contracts involving guardrail work that contain [the challenged] subcontractor compensation clause at least once per year in Colorado, that Adarand is *very likely* to bid on each such contract, and that Adarand often must compete for such contracts against small disadvantaged businesses, we are satisfied that Adarand has standing to bring this lawsuit." (*Ibid.,* italics added.)

*The Trial Court's Ruling*

The trial court granted summary judgment to Cornelius. On the issue of standing, it ruled: "Plaintiff has put forth sufficient facts to show he has

suffered and will suffer injury in fact as a result of the DBE program. [¶] According to plaintiff's declaration under penalty of perjury, he was vice president of operations at Wagner Construction until January, 1994. Wagner specialized in the kind of public contracting work administered by MTA. As plaintiff stated in his deposition of April 29, 1994, Wagner has bid on every subway station on the Red Line. [¶] Defendant makes much of the fact that plaintiff and Wagner are not one and the same. This is inconsequential, however, inasmuch as plaintiff obviously held a significant position at Wagner and would suffer individually if Wagner suffered as an entity. [¶] Moreover, plaintiff's uncontroverted declaration also states that he has been an independent contractor, that he is fully capable of bidding on MTA projects, and that he wishes to compete for MTA contracts in the future. [¶] A similar showing was sufficient to confer standing in *Adarand* . . . . In *Adarand*, the United States Supreme Court concluded that plaintiff would bid on another government contract in the near future, based on the deposition of plaintiff's general manager, who stated that his company bids on every guardrail project in the state. [Citation.]"

*Discussion*

MTA and amici curiae on its behalf vigorously contend that the trial court erred in finding that Cornelius had standing to launch his constitutional attack because Cornelius failed to establish an actual or imminent injury. In particular, they rely upon the fact that Cornelius is *not* a licensed contractor and therefore unable as a matter of law to submit *any* bids on MTA projects and the fact that Cornelius has no *ownership* interest in either his former employer (Wagner) or his present employer (Malcolm) but instead was a mere employee and thus has suffered no tangible injury based upon either employer's inability to bid successfully on MTA projects. Stated another way, MTA urges that Cornelius has not shown, as required by United States Supreme Court decisions, that he is able and ready to bid on contracts but that discriminatory policies prevent him from doing so. We agree. (Cf. *Bras v. California Public Utilities Com'n* (9th Cir. 1995) 59 F.3d 869, 873-874 [architect who had provided services for 22 years but was now precluded from submitting bids although willing to do so had standing to raise equal protection claims].)

*Adarand, supra*, 515 U.S. __ [132 L.Ed.2d 158, 115 S.Ct. 2097], upon which the trial court relied, is distinguishable because (1) the plaintiff was the contractor, as opposed to a mere employee of the contractor; and (2) the plaintiff demonstrated that it had bid in the past and that it would continue to do so.

The trial court's finding that Cornelius "obviously held a significant position at Wagner and would suffer individually if Wagner suffered as an entity" is supported neither by fact nor by law. Factually, Cornelius made no showing as to the significance of being a vice-president at Wagner. Because Cornelius's declaration studiously avoids alleging any ownership or equity interest in the firm, the only reasonable inference is that his title of "vice president" is nothing more than a ceremonial or convenient title conferred on an employee to accomplish a particular task. Thus, Cornelius's many references to "my former firm" and "my firm" are misleading to the extent the references suggest he had or presently has any ownership interest therein.

Furthermore, even were one to find that Cornelius would suffer if his employer did, acceptance of that argument to establish standing could potentially mean that *any* employee of a contractor—from executive to construction worker to clerical staff—could litigate the constitutionality of policies he or she claimed prevented the employer from obtaining a project as could a third party who would supply materials to the contractor were the contractor's bid successful. Settled case law interpreting article III of the federal Constitution holds that a litigant may *not* assert the rights of a third party. This precedent precludes acceptance of Cornelius's argument. Absent a showing of "demonstrable, particularized injury, there can be no confidence of 'a real need to exercise the power of judicial review' or that relief can be framed 'no broader than required by the precise facts to which the court's ruling should be applied.' [Citation.]" (*Warth* v. *Seldin* (1975) 422 U.S. 490, 508 [45 L.Ed.2d 343, 360, 95 S.Ct. 2197].) Consequently, to the extent that Cornelius relies upon a claim of injury to his employer, this case resembles *Rocks* v. *City of Philadelphia* (3d Cir. 1989) 868 F.2d 644. There, five residents and taxpayers who were not involved in the construction industry sued to challenge the constitutionality of minority business enterprise participation requirements applied to a city construction project. The court found the plaintiffs lacked standing because they rested their claims on the rights of third parties—those in the construction industry who were directly harmed by the challenged policy. (*Id.* at p. 648.)

Nor can Cornelius establish standing in his own right. In that regard, the significant fact is that Cornelius is a registered civil engineer, not a *licensed* contractor. The standard solicitation document for MTA construction projects expressly states that " 'all bidders must possess the proper license at time of bid submittal. A California State Contractors License Classification 'A' – General Engineering Contractor is required of the prime bidder. All subcontractors must possess the appropriate licenses for each specialty

subcontracted.' "[3] This document simply reflects the requirements imposed by statutory law. (See, e.g., Bus. & Prof. Code, §§ 7026, 7028, 7028.15, 7059, subd. (b).) Thus, Cornelius has been and remains incapable as a matter of law of submitting a bid to the MTA *as a general contractor*. His assertions that he is a licensed engineer or an "independent contractor" are insufficient to establish his ability to bid directly on an MTA project.

In an effort to avoid the force of this conclusion, Cornelius first notes that Business and Professions Code section 7051 provides that the requirement of holding a contractor's license "does not apply to a licensed architect or a registered civil or professional engineer acting solely in his or her professional capacity" and then points to MTA bid documents which suggest that a general contractor could choose to retain the services of a registered engineer to perform a discrete task such as design and calculation of excavation support systems. (See fn. 3, *ante*.) From this Cornelius argues that "as a registered civil engineer, [he] *may* bid on work for MTA contracts that require this type of work and provide professional engineering services under contract with MTA general contractors. He is therefore ready, willing, and able to compete for MTA contracts . . . ." (Italics added.) This argument is unpersuasive on the record presented. As explained above, according to his own declaration, the bulk of Cornelius's time in the construction industry has been spent as an *employee* of a licensed contractor (Wagner Construction or Malcolm Drilling), a time period in which he never alleged that he submitted any bids on his own behalf. To the extent that Cornelius was self-employed for a brief period, his declaration merely asserted in a conclusory fashion that he was "an independent contractor from January to August, 1994, . . . specializing in public contracting work, specifically of the type administered by the [MTA]" and that in his "former consulting status, [he] was fully capable of performing work on MTA projects. . . . [His] former clients wished to bid on MTA projects but could not compete equally because of the DBE program." The declaration notably failed to allege that Cornelius either bid or ever intends to submit a bid *to a general contractor in his capacity as a licensed engineer*. Claiming that he was capable of performing work on an MTA project is not the same as claiming he bid or wanted to bid as a licensed engineer; the former claim embraces many more possibilities than that called for by the latter discrete task. In fact, the declaration strongly suggests that as an "independent contractor" or "consultant," Cornelius was merely advising those who may have wished to submit bids to the MTA; if so, Cornelius once again comes up against the well-settled principle that standing cannot be established by asserting that the rights of a third party have been violated.

---

[3]Following oral argument, we requested, and received, further briefing from the parties on the licensing requirements involved in MTA projects.

In conclusion, the equal protection issues raised by Cornelius involve the obligation of a general contractor on an MTA project to comply with the DBE requirements. But the fact that Cornelius is a licensed engineer—a status which qualifies him to perform a discrete task for a general contractor—is too tangential a fact to confer standing upon Cornelius to challenge the DBE criteria. That is, the inchoate possibility based upon his possession of an engineer's license that Cornelius could have or may want to bid and, if so, the DBE criteria would deny him the ability to compete on an equal footing, is insufficient to make the showing, as required by case law, of an imminent injury.

Our conclusion is fortified by contrasting Cornelius's showing to that made in cases where the reviewing court found the plaintiff did have standing because imminent injury was established. For instance, in *Adarand,* not only did the subcontractor establish it had already unsuccessfully bid, but it also showed "that sometime in the relatively near future it [would] bid on another government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors." (*Adarand, supra,* 515 U.S. at p. __ [132 L.Ed.2d at p. 171, 115 S.Ct. at p. 2105].) In *Bras* v. *California Public Utilities Com'n, supra,* 59 F.3d 869, the plaintiff had provided services for 22 years to Pacific Bell but was now precluded for a 3-year period from even submitting any bids to Pacific Bell because he was not certified as a minority/women business enterprise. And in *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville, supra,* 508 U.S. 656 [124 L.Ed.2d 586, 113 S.Ct. 2297], plaintiff—the association of contractors—had alleged that its members regularly bid on city contracts and would have bid on contracts set aside for minority- or female-owned businesses but for the fact that the city's ordinance made those contracts unavailable to them. (*Id.* at pp. 658-659, 667-669 [124 L.Ed.2d at pp. 592-593, 598-599].) From these cases, we distill the principle that in order for a party to show that the future use of the DBE criteria will cause an actual or imminent injury, the party must minimally show it has bid in the past and would continue to bid in the future. Cornelius has not made that showing. Although Cornelius's lawsuit raises important questions of constitutional law which have broad societal impact, his ability to obtain judicial resolution of those questions is dependent upon establishing standing through a showing of imminent injury. (See *Gladstone, Realtors* v. *Village of Bellwood* (1979) 441 U.S. 91, 99-100 [60 L.Ed.2d 66, 76-77, 99 S.Ct. 1601].) "[I]t is this requirement that gives a litigant a direct stake in the controversy and prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders." (*United States* v. *SCRAP* (1973) 412 U.S. 669, 687 [37 L.Ed.2d 254, 269, 93 S.Ct. 2405].)

## B. *Standing as a Taxpayer*

*Facts*

To establish standing as a taxpayer, Cornelius averred: "The taxpayers pay up to 10% higher for the exact same quality of work for no reason other than the contractor's race and/or gender. [¶] 14. I have paid local Los Angeles County sales taxes on numerous occasions and will pay said taxes in the future. [¶] 15. I have paid California state income tax on numerous occasions and will pay said tax in the future. [¶] 16. I have purchased fares on MTA public transportation and will purchase said fares in the future. [¶] 17. I have paid state gasoline taxes on numerous occasions and will pay said tax in the future. [¶] 18. My tax burden is increased because of MTA's DBE program." In answers to interrogatories, Cornelius conceded he neither owned nor paid taxes on real property in Los Angeles County and that he was a resident of San Diego County.

Cornelius raised this theory of taxpayer standing in the trial court but the court did not base its ruling upon it and, in fact, expressed its disagreement with it during an earlier proceeding when it indicated that Cornelius would have to show injury in fact to establish standing.[4] As already noted, in finding standing, the trial court instead accepted Cornelius's argument that he had made the showing required by federal case law. However, to ensure a thorough analysis of this matter, we have requested briefing on the issue of taxpayer standing and therefore address and resolve that theory.

*Statutory and Decisional Law*

Code of Civil Procedure section 526a provides, in pertinent part: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either *by a*

---

[4]The court stated, in part: "You can't challenge the constitutionality, in my view, just because you have taxpayer standing as a state taxpayer. [¶] You are challenging the local MTA's . . . decision . . . . You're challenging a particular program which is perhaps different here than it is someplace else. RTD—or—or San Francisco had a different set aside, a different program, and maybe, who knows San Diego has still another one, and someplace else has still another one, and just because you're a California state taxpayer, you can't flit all over and just file these suits, in my view. That's my interpretation of the law. And so far as I'm concerned, unless you can show that you've been injured somehow or may be injured by this program, not as a taxpayer but as a participant in the activity which is—this program affects, you don't have standing. It's just as simple as that. Find somebody else in L.A. who has been bidding and who is affected."

*citizen resident therein*, or by a corporation, *who is assessed for and is liable to pay, or*, within one year before the commencement of the action, *has paid, a tax therein.*" (Italics added.)

■ MTA first urges Cornelius lacks standing because he has not paid real property taxes in Los Angeles County and is not a resident of Los Angeles County. The issue of what type of tax the plaintiff must pay in order to have standing under Code of Civil Procedure section 526a has never been clearly resolved. In cases involving claims against local government, the California Supreme Court found standing through the payment of real property taxes. (See, e.g., *Irwin* v. *City of Manhattan Beach* (1966) 65 Cal.2d 13, 18-20 [51 Cal.Rptr. 881, 415 P.2d 769], and *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 269 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].) However, as Cornelius points out, those cases did *not* hold that property tax payment was an absolute requirement of standing, but only that it fulfilled the standing requirement. The language of the statute—section 526a speaks in terms of "an assessed" tax—is consistent with ad valorem property taxes, be that on real property or personal property. For instance, Black's Law Dictionary defines assessed as: "Term is equivalent to 'imposed.' To value or appraise. [Citation.]" (Black's Law Dict. (6th ed. 1990) p. 116, col. 1.) The case Cornelius cites for the proposition that property taxes are not required—*Regus* v. *City of Baldwin Park* (1977) 70 Cal.App.3d 968, 972 [139 Cal.Rptr. 196]—is distinguishable because the appeal involved only the issue of standing to pursue a Code of Civil Procedure section 863 validation action against a redevelopment project (70 Cal.App.3d at p. 971) so that any other statements in the opinion are dicta.

Another impediment to Cornelius's use of Code of Civil Procedure section 526a is the fact that he is not a resident of Los Angeles County. Although *Irwin* v. *City of Manhattan Beach, supra*, 65 Cal.2d 13, found the requirement of residency unconstitutional, it did so in the context of a nonresident who owned and paid taxes on real property located in the city he was suing. That element is clearly lacking here.

To a certain extent, Cornelius attempts to overcome these potential obstacles to his claim of taxpayer standing by arguing that the MTA is the functional equivalent of a state agency so that his payment of gasoline, sales, and state income taxes confers standing. In order to address this contention, we will analyze the statutory right to bring a taxpayer action against a state agency, the nature of the MTA, and the sources of MTA funding.

Although the express language of Code of Civil Procedure section 526a only authorizes suit against *local* government, case law has, without any real

analysis of either the statute's legislative history or express terms, expanded the right to bring a taxpayer action to include suit against *state* government. (*Stanson* v. *Mott* (1976) 17 Cal.3d 206, 222-223 [130 Cal.Rptr. 697, 551 P.2d 1]; *Blair* v. *Pitchess, supra,* 5 Cal.3d at p. 268; *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 618, fn. 38 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]; *Central Valley Chap. of 7th Step Foundation* v. *Younger* (1979) 95 Cal.App.3d 212, 232 [157 Cal.Rptr. 117]; *Duskin* v. *San Francisco Redevelopment Agency* (1973) 31 Cal.App.3d 769, 773-775 [107 Cal.Rptr. 667]; *California State Employees' Assn.* v. *Williams* (1970) 7 Cal.App.3d 390, 395 [86 Cal.Rptr. 305]; and *Ahlgren* v. *Carr* (1962) 209 Cal.App.2d 248, 252-254 [25 Cal.Rptr. 887]; but see *Los Altos Property Owners Assn.* v. *Hutcheon* (1977) 69 Cal.App.3d 22, 27, fn. 6, 28-29 [137 Cal.Rptr. 775].) None of those cases, however, noted, discussed, or examined the precise question of the particular tax the plaintiff had paid in order to satisfy the element of standing. Furthermore, those cases are distinguishable from this matter because each involved a suit against a particular state official and alleged that the official's actions were illegal whereas this case involves a challenge to the MTA's implementation of the DBE, a program with which it must comply in order to receive federal funding.[5] (See, e.g., *California Assn. for Safety Education* v. *Brown* (1994) 30 Cal.App.4th 1264 [36 Cal.Rptr.2d 404] [actions against State Treasurer to prohibit transfer of funds]; *Central Valley Chap. of 7th Step Foundation* v. *Younger, supra,* 95 Cal.App.3d 212 [action against State Attorney General alleging that policy re availability and retention of arrest records is unconstitutional]; *Farley* v. *Corley* (1978) 78 Cal.App.3d 583 [144 Cal.Rptr. 923] [action against State Controller alleging his policies about dormant bank accounts resulted in financial loss to state treasury]; and *Ahlgren* v. *Carr, supra,* 209 Cal.App.2d 248 [action to prevent State Controller and State Director of Finance from spending money in violation of legislative conditions].) Stated another way, those cases are peculiar to their particular fact patterns. Contrary to Cornelius's argument, the cases provide no reliable compass for this court to determine if he has standing to sue MTA as a taxpayer.

In any event, the MTA is not a state agency which relies exclusively on state taxes to fund it. The Legislature created the MTA in 1992 to act as the successor to the Southern California Rapid Transit District and the Los Angeles County Transportation Commission. (Pub. Util. Code, § 130050.2.) The MTA's governing board consists of the five members of the Los

___

[5]In a similar vein, Public Utilities Code section 130051.19, subdivision (b) provides: "The [MTA] shall, prior to the approval of any contract by [it] or by its organization units, adopt and implement a disadvantaged business enterprise program which establishes participation goals of not less than 15 percent of the dollar value of all contracts by minority business enterprises and not less than 5 percent by women business enterprises."

Angeles County Board of Supervisors, the Mayor of Los Angeles, a member of the Los Angeles City Council, two individuals appointed by the Mayor of Los Angeles, and four individuals, each of whom is a mayor or city council member of a city other than Los Angeles but located in Los Angeles County. (Pub. Util. Code, § 130051, subds. (a) through (d).) The 14th member is a *nonvoting* member appointed by the Governor. (Pub. Util. Code, § 130051, subd. (f).) The MTA has the power, inter alia, to make contracts (Pub. Util. Code, § 130051.12, subd. (k)), to exercise the right of eminent domain (Pub. Util. Code, § 130220.5), and to impose "a transactions and use tax" based upon voter approval (Pub. Util. Code, § 130231, subd. (a).) Significantly, the MTA also has the power to approve "benefit assessment districts" (Pub. Util. Code, § 130051.12, subd. (j)) in the areas surrounding the proposed subway which levy assessments on the commercial real property along the subway route. The money raised through the assessments is used to pay the principal and income on bonds issued to finance the construction. (*Southern Cal. Rapid Transit Dist.* v. *Bolen* (1992) 1 Cal.4th 654, 660-662 [3 Cal.Rptr.2d 843, 822 P.2d 875].)

For the fiscal year 1994-1995, MTA derived its revenue as follows: 48 percent from local government, 29 percent from the federal government, 15 percent from the state government, and 9 percent from fares. The primary source of local funding is through sales taxes enacted by the voters of Los Angeles County. State funding comes from gasoline tax revenues and the sale of bonds. The principal and interest on the bonds is paid from the state's General Fund which is primarily funded by payment of personal and corporate state income taxes as well as the state sales tax.

Coupling the method of MTA's funding with Cornelius's declaration that he pays state income taxes as well as gasoline taxes and sales taxes when he is in Los Angeles County, Cornelius urges he has established sufficient standing as a taxpayer.[6] We disagree.

Sales taxes are generally construed to be taxes on the retailer, not the consumer to whom the retailer passes the burden. (See *Torres* v. *City of Yorba Linda* (1993) 13 Cal.App.4th 1035 [17 Cal.Rptr.2d 400].)[7] The same analysis applies to gasoline taxes. (See Rev. & Tax. Code, §§ 7351 [fuel tax

[6]Cornelius's argument that his payment of fares to the MTA confers standing is borderline frivolous. A fare to ride a subway is not a tax; it is the consideration *voluntarily* given in return for the service provided.

[7]In his petition for rehearing, Cornelius raises for the first time the argument that his payment of a use tax as opposed to a sales tax was sufficient to confer standing to bring a taxpayer suit. By so urging, Cornelius apparently concedes our point that payment of a sales tax is insufficient to confer standing. In any event, Cornelius notes that in 1980 and in 1990,

is imposed on the distributor] and 8733 [fuel tax is debt owed by vendor] and *People* v. *Sonleitner* (1960) 185 Cal.App.2d 350, 366 [8 Cal.Rptr. 528] [intent of gas tax law is to levy tax upon distributor of gasoline who can recapture the money from consumer].)

Consequently, the dispositive issue is whether Cornelius's payment of state income taxes is sufficient to confer standing to bring a taxpayer suit. The parties concede no case based upon a similar fact pattern has so held.

Three factors militate against resolving the issue in Cornelius's favor. The first factor is the tangential relationship between the taxes paid and the policy being contested. State income taxes constitute only a *partial and indirect* source of funding for the MTA. State money provides only 15 percent of the MTA's funding. That funding comes from two sources: gasoline taxes and bonds. To the extent that state income taxes inure to the benefit of the MTA, it is because the taxes go into the General Fund and the General Fund pays the principal and income on the state bonds issued to finance the MTA.

The second factor is the ramification of finding standing on the basis urged by Cornelius. If we were to conclude that the mere payment of state income taxes conferred standing, then any state implemented program which to any degree is directly or indirectly financed by the state income tax could be subject to a legal challenge by any resident in any of our state's 58 counties as long as the resident pays state income taxes. We do not believe

the voters in Los Angeles County approved Proposition A and Proposition C, respectively. Each enactment imposed a retail sales tax and a complementary use tax to help fund expansion of public transit services. (See Pub. Util. Code, §§ 130350-130354.) Cornelius's petition for rehearing first makes the factual claim he "paid these taxes as a user." He then advances the legal argument that payment of a use tax is qualitatively different from payment of a sales tax because it is a tax imposed upon the storage, use, or consumption of personal property as opposed to the purchase of personal property so that payment of a use tax is sufficient to confer standing to sue as a taxpayer.

There is no need to even discuss the merits of this rather dubious legal assertion. (See, e.g., *Rivera* v. *City of Fresno* (1971) 6 Cal.3d 132, 138 [98 Cal.Rptr. 281, 490 P.2d 793] [use tax supplements a sales tax by imposing a burden equivalent to a sales tax when transaction not subject to a sales tax].) For one thing, Cornelius did not raise this argument until he filed his petition for a rehearing. Points made for the first time on a petition for rehearing are not considered. (*County of Sacramento* v. *Loeb* (1984) 160 Cal.App.3d 446, 459-460, fn. 5 [206 Cal.Rptr. 626].) For another thing, the record does not support Cornelius's claim that he ever paid a *use* tax. His declaration, which we have set forth *ante*, averred only that he had paid "local Los Angeles County sales taxes on numerous occasions," as well as state gasoline taxes and state income taxes. In a similar vein, Cornelius's answer to an interrogatory propounded by MTA simply stated: "[Cornelius] has bought and paid sales taxes on merchandise, transportation, food, and lodging within the County of Los Angeles within one year before April 1, 1994." In sum, the record is bereft of any showing that Cornelius paid a use tax in Los Angeles County.

it would be sound public policy to permit the haphazard initiation of lawsuits against local public agencies based only on the payment of state income taxes.

The third factor is the policy behind conferring taxpayer standing under Code of Civil Procedure section 526a. Our Supreme Court has stated that while standing under that section is to be construed liberally, the reason to do so is to allow a challenge to governmental action which would otherwise go unchallenged because of the stricter requirement of standing imposed by case law. (*Blair* v. *Pitchess*, *supra*, 5 Cal.3d at p. 268.) We have given careful and serious consideration to Cornelius's argument that he should be accorded standing because of the significant constitutional issues raised by his action but conclude, nonetheless, that a decision not to grant standing to him does not necessarily result in the DBE program remaining unchallenged. Given the far-reaching scope of MTA's construction activities, the pervasive nature of the construction industry, and the fact that *Adarand* now requires the government to show a compelling state interest to justify the challenged programs, there is no reason to believe that a party who fulfills the case law requirement of actual injury cannot come forward to challenge the DBE program. Consequently, we conclude that there is no need to expand the concept of statutory taxpayer standing beyond that already recognized by law. Any further extension of the concept of taxpayer standing must come from our state Supreme Court.[8]

## C. *Conclusion*

Although the trial court's ruling on standing arose in the context of the parties' cross-motions for summary judgment, the parties have consistently treated the issue as a question of law, not a question of fact. That is, MTA has never asserted that the trial court erred because there was a triable issue of material fact about the question of standing and that the proper remedy is

---

[8]In the event our Supreme Court chooses to review this issue, we make the following comments. We recognize that the purpose of Code of Civil Procedure section 526a is to permit a plaintiff to sue who would not otherwise meet the case law requirement of standing, to wit, being a person directly injured by the policy challenged (see, e.g., *Blair* v. *Pitchess*, *supra*, 5 Cal.3d at pp. 267-268) and that case law has expanded the definition of the governmental entity which can be sued under section 526a. However, once we move beyond the section 526a areas clearly defined by case law such as property owner sues city and state taxpayer sues state official, the prudential limitation on the exercise of federal jurisdiction to hear a constitutional claim—the requirement that the plaintiff has suffered injury as a result of the challenged policy (see, e.g., *Valley Forge College* v. *Americans United* (1982) 454 U.S. 464, 471-476 [70 L.Ed.2d 700, 708-712, 102 S.Ct. 752])—takes on greater significance and should, we believe, be a factor to be considered in determining whether standing under section 526a has been established.

to reverse to permit a trial on that issue. Cornelius, likewise, has never suggested that were this court inclined to agree with MTA's position that he has not established standing, that he at least should be allowed to go to trial on the issue. Instead, each party has essentially urged that the facts are susceptible of only one legal conclusion. Adhering to that approach, we conclude that as a matter of law Cornelius has no standing to pursue his challenge to the DBE. We therefore will reverse the judgment in his favor as well as the postjudgment award of attorney fees and direct the trial court to enter judgment in favor of MTA.

## DISPOSITION

The judgment (entered August 11, 1995) and the postjudgment award of attorney fees (entered October 11, 1995) are reversed and the trial court is directed to enter judgment in favor of defendants on the basis that plaintiff has no standing to pursue his action. The parties to bear their own costs on appeal. The writ of supersedeas issued on December 14, 1995, is to remain in effect until the remittitur has issued.

Hastings, J., and Baron, J., concurred.

A petition for a rehearing was denied November 18, 1996, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied January 28, 1997.